AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Carlos Martinez, Jr. and<br>Michael Anthony Sherman, Jr.<br><br>*Defendant(s)* | Case No. 4 15 71377 BZ<br>OAKLAND VENUE<br>FILED UNDER SEAL |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **(See Below)*** in the county of **Contra Costa** in the **Northern District** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii) | Conspiracy to distribute and possession with intent to distribute controlled substances, including cocaine and 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers |

*Conspiracy dates: beginning on a date unknown, but no later than August 13, 2015 and continuing to October 13, 2015.

Penalties:
Imprisonment: Mandatory 10 years and maximum life
Fine: $10,000,000
Supervised Release: Mandatory 5 years and maximum life
Special Assessment: $100

FILED
OCT 23 2015
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

This criminal complaint is based on these facts:
See the affidavit of DEA Special Agent Austin Curnow attached hereto and incorporated by reference.

Continued on the attached sheet.

APPROVED AS TO FORM:

_____
AUSA KATIE B. MEDEARIS

_____
*Complainant's signature*
Raymundo M. Mallari
Austin Curnow, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 23 Oct 2015

_____
*Judge's signature*

City and state: San Francisco, CA

Bernard Zimmerman, United States Magistrate Judge
*Printed name and title*

Document No.
1
District Court
Criminal Case Processing

```
 1  BRIAN J. STRETCH (CABN 163973)
    Acting United States Attorney
 2
    DAVID R. CALLAWAY (CABN 121782)
 3  Chief, Criminal Division

 4  KATIE BURROUGHS MEDEARIS (CABN 262539)
    Assistant United States Attorney
 5
         1301 Clay Street, Suite 340S
 6       Oakland, California 94612
         Telephone: (510) 637-3680
 7       FAX: (510) 637-3724
         katie.medearis@usdoj.gov
 8
    Attorneys for United States of America
 9
```

**FILED**
OCT 23 2015
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4 15 71377 BZ |
| Plaintiff, | AFFIDAVIT OF SPECIAL AGENT RAYMUNDO MALLARI IN SUPPORT OF CRIMINAL COMPLAINT |
| v. | |
| CARLOS MARTINEZ JR., AND MICHAEL ANTHONY SHERMAN JR., | [UNDER SEAL] |
| Defendants. | |

MALLARI AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

1

I, Special Agent ("SA") Raymundo Mallari of the United States Department of Justice, Drug Enforcement Administration ("DEA") do swear and affirm as follows:

## I. INTRODUCTION

### A. **Purpose of Affidavit**

1. I make this affidavit in support of a criminal complaint against Carlos MARTINEZ JR. (hereafter, "MARTINEZ") and Michael Anthony SHERMAN JR (hereafter, "SHERMAN JR) (referred to collectively as the "Defendants") for a violation of Title 21, United States Code, Sections 846 and 841(a)(1),(b)(1)(A)(viii) (conspiracy to possess with intent to distribute and distribution of controlled substances, including cocaine and 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers).

### B. **Sources of information**

2. The facts and information set forth in this Affidavit have been acquired through various investigative techniques, including, but not limited to: the use of an undercover officer; recorded telephone calls (voice and electronic); information received via multiple Federal Title III wiretap[1] intercepts (including wire and electronic communications) on cellular devices used by Carlos OLIVARES HERNANDEZ and others during periods of interception;[2] telephone toll analysis; agent-

---

[1] DEA has conducted multiple wiretaps in the instant investigation. Most recently, on October 9, 2015, agents began intercepting the wire and electronic communications of a successor cellular telephone used by OLIVARES HERANDEZ, and bearing number (909) 528-3824 (hereafter, the "Intercepted Telephone 4"), pursuant to a federal court order. Case No. CR-15-90893-MISC-PJH. Previously, on August 12, 2015, the DEA began intercepting the wire and electronic communications of multiple cellular telephone numbers, including (530) 415-6977 (referred to hereafter, the "Intercepted Telephone 3") which is a predecessor telephone used by OLIVARES HERANDEZ, pursuant to a federal court order. Case No. CR-15-90714-MISC-PJH. DEA has also intercepted the communications of other cellular telephones in this matter, pursuant to federal court order(s).

[2] Throughout this Affidavit, I describe some, but not all, of the voice and text message conversations between OLIVARES HERNANDEZ and others recorded during the course of this investigation. Many of these communications are draft translations and/or summaries of wire or electronic communications occurring in the Spanish language and were generated with the assistance of Spanish language monitors. These draft summaries or translations may change before converted to final form.

My summary of these conversations is based on my and/or other investigators review of the recordings of the conversations, my training, experience, and knowledge of this investigation, and information provided to me by other experienced law enforcement personnel as to the meaning of vague or coded language and certain words and phrases, as well as the practices of the individuals involved in the manner in which certain crimes are committed. My summaries of the conversations, which are often

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

directed and observed drug purchases by a UC from individual(s) supplied by OLIVARES HERNANDEZ's drug trafficking organization ("DTO"); physical and electronic surveillance operations; the use of public and law enforcement databases; information obtained from sources who have knowledge of the criminal activities of the subjects of the investigation and their co-conspirators; and conversations with and/or review of reports drafted by other federal, state, and local law enforcement officials.[3]  I am also familiar with the facts and circumstances of this case as a result of my personal participation in this investigation.  I believe the information gathered from the aforementioned list of sources and investigative techniques to be reliable.  Because this Affidavit is submitted for the limited purpose of setting forth probable cause for the requested Complaint, I have not included each and every fact known to me concerning this investigation.  Rather, I have included what I believe to be adequate facts to establish probable cause that evidence of alleged violations have been committed by the Defendants.  I do not rely on facts not set forth herein to support my conclusion that such probable cause has been established.

3. Further, my beliefs, conclusions, and opinions set forth throughout this Affidavit (often prefaced with the phrase "I believe") are based on my experience and training as a DEA Special Agent, as well as the training and experience of other agents, deputies, and officers assisting in this investigation, my familiarity with the methods used by narcotics traffickers to import, manufacture, and

---

prepared with the assistance of a Spanish language interpreter/monitor, are an overview and are not intended as verbatim transcripts.  Despite the draft nature of these translations/summaries, I have included in quotation marks in some instances in an attempt to provide a rough transcript of some of the speaker's words during the conversations.

In addition, I know, based on my training, experience, and knowledge of this investigation, that individuals engaging in narcotics trafficking frequently use slang or coded or intentionally vague language when discussing illegal activity.  When a word or phrase used by a speaker constitutes slang or coded or intentionally vague language (or whose meaning would not be obvious), I have provided my interpretation of those words and/or phrases in parentheses or described my understanding following reference to the code/slang.  My interpretation is based on my training and experience regarding narcotics traffickers, my knowledge of and participation in this investigation, and my discussions with other experienced law enforcement personnel.  My interpretation of these communications, however, may change as additional information is learned through the course of the investigation.  The actual names of the sender/receivers have been used where agents believe they have determined the identity of the sender/receiver with some certainty.

[3] Of note, I have used the term "agents" throughout this Affidavit to identify other agents or local law enforcement officers who have made observations during the course of this investigation.

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

3

distribute illegal narcotics and collect and launder the proceeds from the sales of illegal narcotics, my direct participation in this investigation, and conversations with other law enforcement personnel familiar with this investigation and/or the methods of operation used by narcotics traffickers.

## II.   AFFIANT BACKGROUND AND APPLICABLE LAW

### A.   Agent Experience and Background

4.   I am a Special Agent with the DEA. I have held this position since July, 2002. Over the past ten years, I have served in two different DEA offices, namely in San Juan, Puerto Rico and San Francisco, California.

5.   Prior to my employment with the DEA, I served as an officer in the United States Army from 1990 to 2001. During this time, I served in the Infantry and Military Intelligence branches and spent time overseas. I served in Central and South America, including a tour as a military advisor to the Colombian Army in counter-drug and counter-insurgency operations.

6.   As a DEA special agent, I received extensive training through the DEA Basic Agent Training Academy in Quantico, Virginia. At the Academy, I completed sixteen weeks of full-time, formalized education and training. The training addressed topics including, but not limited to, drug detection, drug interdiction, money laundering techniques and schemes and the investigation of individuals and organizations involving the smuggling, cultivation, manufacturing and illicit trafficking of controlled substances.

7.   I have also received on the job training from other experienced DEA special agents and experienced local law enforcement officers in the Territory of Puerto Rico and the State of California who are recognized experts in the field of narcotic investigations. My on the job training has included topics such as asset identification and removal, confidential source management, violent street gangs and money laundering investigations. I have almost daily conversations with other experienced DEA special agents regarding narcotics and narcotic related subjects for the purpose of expanding and developing my expertise in the areas of identification, sales, possession for sales and distribution of narcotics, and methods of operation of narcotic traffickers.

8.   As a special agent, I have participated in numerous investigations involving narcotics and

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

4

controlled substances such as cocaine, heroin, methamphetamine, LSD, marijuana and MDMA. These investigations have ranged in scale from local street dealers to international drug traffickers, money launderers and narco-terrorists. The investigations have resulted in arrests of many individuals, the seizure of illicit drugs and drug related evidence and the forfeiture of drug related assets.

9. My experience as a special agent also includes actively participating in numerous search warrants authorizing the search of locations such as residences, businesses, and vehicles related to drug traffickers and their co-conspirators. In addition, I have participated in hundreds of hours of surveillance operations, observing and recording movement of persons trafficking in drugs and those suspected of trafficking in drugs. I have led numerous undercover operations and have acted as the primary undercover agent on numerous investigations involving the negotiation, purchase and sale of controlled substances. I have also participated in numerous wiretap investigations and been involved in review of transcripts and/or call summaries generated therefrom. My involvement has included the interpretation of coded communications related to drug trafficking activities.

10. My experience as a special agent also includes working with confidential sources. I have been the primary controlling agent for a number of high-level confidential sources, both domestic and international. I have participated in numerous interviews of confidential sources and individuals involved in the illegal trafficking in drugs and substances and have had numerous discussions regarding their various operations. I have read official reports of similar interviews by other experienced special agents of the DEA and other law enforcement officers experienced in other drug related investigations. As a result of my experience, I have encountered and have become familiar with the day to day operations and the various tools, methods, trends, paraphernalia and related articles utilized by various traffickers in their efforts to possess, import, conceal, and distribute controlled substances. I am one of the agents participating in the investigation involving the above-listed defendants for drug trafficking.

B. **Applicable Law**

11. Title 21, United States Code, Sections 841 and 846 prohibit a person from manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute or dispense a controlled substance and from conspiring to commit any of the aforementioned crimes. The elements each of the

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

above-listed offenses are described in greater particularity below:

    (a)    21 U.S.C. § 841(a)(1): the defendant (1) knowingly manufactured, distributed, dispensed, or possessed with the intent to manufacture, distribute, or dispense; (2) a controlled substance.

    (b)    21 U.S.C. § 846: the defendant (1) had an agreement to accomplish an illegal objective, *i.e.*, a violation of 21 U.S.C. § 841(a)(1); and (2) had the intent to commit the underlying offense.

Per Section 841(b)(1)(A)(viii), any person who violates Section 841(a)(1) in a case involving 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers is subject to a mandatory minimum term of imprisonment of ten years and a maximum penalty of life imprisonment.

## III. FACTS ESTABLISHING PROBABLE CAUSE

### A. Overview of Investigation

12. Beginning in June of 2015, members of the DEA and members of the Concord Police Department ("CPD") began an investigation into the methamphetamine and cocaine trafficking activities of Carlos OLIVARES HERNANDEZ (hereafter, "OLIVARES HERNANDEZ"). The instant investigation has involved the use of multiple wiretaps authorized by the Honorable Phyllis J. Hamilton. To date, the investigation has revealed that OLIVARES HERNANDEZ and his associates receive bulk quantities of methamphetamine and cocaine from couriers and other co-conspirators based in Southern California and/or Mexico. OLIVARES HERNANDEZ acts as a regional distributor for the subject drug trafficking organization ("DTO") and he is based in the Central Valley of California. OLIVARES HERNANDEZ and his associates sell and/or distribute drugs in the Central Valley, the San Francisco Bay Area, and other locations. The investigation has resulted in the identification of numerous co-conspirators of OLIVARES HERNANDEZ, including the Defendants. The Defendants were intercepted on numerous occasions discussing drug-trafficking related matters with OLIVARES HERNANDEZ.

13. Agents have executed numerous search warrants and arrested various co-conspirators to date. On October 13, 2015, executed search warrants at the residences of five other individuals/co-

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

6

conspirators who were likewise intercepted during the course of the wiretap investigation and seized the following estimated[4] quantities of suspected drugs,[5] cash, firearms, and other related items: 30 kilograms of cocaine, 20 pounds of methamphetamine, 15 pounds of heroin, $1,000,000 in bulk cash, six handguns, two rifles, one AK-47 assault rifle, a bullet proof vest, and three vehicles containing hidden compartments. In addition, agents seized an estimated 33 pounds of methamphetamine from another associate/courier on September 5, 2015 and an estimated $300,000 to $500,000 from another associate/courier on October 12, 2015.

### B. Summary of the Defendants' Arrest Respective Involvement in Drug Trafficking[6]

14. Defendants were arrested on October 22, 2015 and their residences were searched pursuant to federal search warrants. During the searches, agents discovered $33,000 in bulk cash concealed within articles of clothing in a closet at the residence of SHERMAN JR and three firearms at the residence of MARTINEZ. Agents also seized cellular telephones used by SHERMAN JR and MARTINEZ to communicate with OLIVARES HERNANDEZ during the wiretap interception period(s) in August and/or October of 2015. Included below is a general summary of the facts establishing probable cause of the Defendants' participation in drug trafficking.

    a. <u>MARTINEZ</u>: During the wiretap investigation, MARTINEZ was intercepted numerous times using multiple cellular devices to discuss drug-related matters with OLIVARES HERNANDEZ, including but not limited to: the receipt/transfer of drug-related proceeds and the introduction of prospective drug customers. Agents have also conducted physical and electronic

---

[4] The search warrants occurred at five locations and were executed the same day that this Affidavit was drafted. As such, the quantities included herein are rough estimates and do not reflect official money counts or drug weights. These estimates are provided to the Court, however, to offer a sense of the scope of the subject DTO's drug activities and the rough quantities of drugs attributed to the organization based on the execution of recent search warrants and arrests.

[5] The suspected drugs listed in this Affidavit were consistent in appearance with the identified controlled substance. However, the laboratory results of the substances are pending and/or have yet to be requested. As such, the substances are referred to herein as "suspected" drugs. Nevertheless, I believe there is probable cause to support the conclusion these substances are the alleged identified narcotics.

[6] Of note, the facts discussed herein represent some of the investigation to date, but are not inclusive of all interactions with or evidence against the Defendants, their co-conspirators, and/or other members of the subject DTO.

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

surveillance operations wherein they observed activities consistent with the facilitation of drug transactions and the transportation of drug-related proceeds. Agents arrested MARTINEZ on October 22, 2015 and searched his residence located at 29394 Pacific Street, Hayward, California (hereafter, "29394 Pacific St."), pursuant to a federal search warrant, and located at least two cellular telephones previously intercepted in communications with OLIVARES HERNANDEZ via the Intercepted Telephone 3 and the Intercepted Telephone 4. Based on the investigation to date, I believe MARTINEZ is a narcotics "facilitator," which is a term used to describe a co-conspirator who assists by: (1) coordinating the delivery and/or pick-up of drugs and drug-related proceeds; (2) providing their residence as a meeting location for drug-related activities and/or as a stash house location for the subject DTO; and/or (3) functions in a broker-type capacity by introducing customers to the DTO.

  b. <u>SHERMAN JR</u>: SHERMAN JR, who was previously referred to in the instant investigation as Unknown Male ("UM") 18, was arrested at his residence, located at 315 Emory Oak Place in Lathrop, California (hereafter, "315 Emory Oak") on October 22, 2015. Agents also searched his residence, pursuant to a federal search warrant, and discovered bulk cash and at least one cellular telephones intercepted in communication with OLIVARES HERNANDEZ via Intercepted Telephone 3. During these intercepted communications, SHERMAN JR and OLIVARES HERNANDEZ discussed the distribution of bulk-quantities of drugs, details about particular narcotics, and the repeated transfer of drug proceeds to OLIVARES HERNANDEZ.

  15. Based on the facts described herein, I believe there is probable cause to conclude the Defendants conspired with one or more persons identified in this Affidavit and/or other unidentified associates of the subject DTO to distribute drugs, including cocaine and 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, thereby rending a 10 year mandatory minimum term of imprisonment applicable in this case.

  **C.** **<u>MARTINEZ</u>**

  16. The intercepted communications, surveillance operations, and items seized from MARTINEZ's residence described below establish probable cause that he conspired with one or more

members of the subject DTO to traffic bulk-drug proceeds. MARTINEZ contacts OLIVARES HERNANDEZ using multiple cellular telephone devices to discuss various drug-related matters. I further believe MARTINEZ is as a narcotics broker and/or "facilitator" for OLIVARES HERNANDEZ.

        ***1.  Examples of Intercepted Communications and Surveillance Observations Connecting MARTINEZ to the Conspiracy and DTO Activities***

        i.    <u>MARTINEZ Delivers Suspected Drug-Related Proceeds to OLIVARES HERNANDEZ's Residence</u>

17. On September 5, 2015, agents observed the delivery of suspected drug-related proceeds by MARTINEZ at OLIVARES HERNANDEZ's residence. My belief is based on the observations and related intercepted communications described below, as well as the investigation to date.

18. At approximately 2:35 p.m., agents were monitoring a live-feed pole camera overlooking OLIVARES HERNANDEZ's residence at 503 E. Springer Drive, Turlock, California. Agents observed a dark colored Toyota Camry (bearing California license plate 6UJE482) arrive and stop at the foot of the driveway to the residence. This vehicle is registered to MARTINEZ's sister, Jeanette Martinez, at his residence (29394 Pacific St, Hayward, California).

19. Next, agents observed MARTINEZ exit the passenger-side of the vehicle, briefly access the trunk area of the vehicle, and then close it. MARTINEZ then walked toward the residence carrying a brown paper shopping bag in his left hand and a dark colored duffel bag in his right hand. MARTINEZ approached the residence, placed the bags on the ground, and then stood at the front door to the residence. Moments later, agents observed a young Hispanic male (believed to be Carlos OLIVARES JR., which is OLIVARES HERNANDEZ's son), open the front door and let MARTINEZ enter the residence. Less than one minute later, agents observed a white vehicle pull into the driveway of the residence. Soon thereafter, MARTINEZ exited the residence carrying the same two bags and walked to the white vehicle in the driveway.

20. At approximately 2:42 p.m., OLIVARES HERNANDEZ received a call from MARTINEZ, who was located at OLIVARES HERNANEZ's residence based on physical location data obtained from his telephone. During the call, MARTINEZ said there was no one there (i.e. at OLIVARES HERNANDEZ's residence) to "leave the note with." In response, OLIVARES

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

        9

HERNANDEZ told MARTINEZ to leave it there and somewhere in a drawer. MARTINEZ said the only one there (i.e. at OLIVARES HERNANDEZ's residence) was "Carlitos" and asked if MARTINEZ should leave "it" with him. OLIVARES HERNANDEZ told MARTINEZ to tell "Ale" to put "it in the room." ("Ale" is suspected to be Alejandra OLIVARES, OLIVARES HERNANDEZ's daughter, and is referred to hereafter as "ALEJANDRA.")[7] OLIVARES HERNANDEZ asked to speak to her. Moments later, a female (presumably ALEJANDRA) got on the phone. OLIVARES HERNANDEZ told ALEJANDRA to put MARTINEZ's "note" in OLIVARES HERNANDEZ's room. OLIVARES HERNANDEZ told ALEJANDRA to put "it" somewhere and OLIVARES HERNANDEZ would call later to ask where she placed it. ALEJANDRA agreed. Then, MARTINEZ got back on the phone and said "after this" he only owed OLIVARES HERNANDEZ "1200" and would "complete it" once MARTINEZ got back from travel. OLIVARES HERNANDEZ acknowledged.

21.     I believe the above-described intercepted conversation and surveillance observations are related to the delivery of drug proceeds by MARTINEZ to OLIVARES HERNANDEZ's residence. More specifically, I believe MARTINEZ arrived at OLIVARES HERNANDEZ's house and determined that "Carlitos" (OLIVARES HERNANDEZ's son) was the only person there who could receive the money. In response, I believe OLIVARES HERNANDEZ directed MARTINEZ to give the bulk drug proceeds to ALEJANDRA (his daughter) and have her hide them inside of the residence. I further believe OLIVARES HERNANDEZ spoke directly with his daughter ALEJANDRA via telephone and instructed her to hide the bulk proceeds (referred to in code as MARTINEZ's "note") within OLIVARES HERNANDEZ's room and further advised her to be available later to telephonically guide OLIVARES HERNANDEZ to the location in where she placed the money. Following their conversation, MARTINEZ got back on telephone for the purposes of relaying the amount delivered, confirming he still owes OLIVARES HERNANDEZ $1,200 (referred to as "1200") in additional drug proceeds, and informing OLIVARES HERNANDEZ that he will have the additional proceeds when he returns from his "travel."

      ii.     Additional Intercepted Communications Between OLIVARES

---

[7] Agents have intercepted prior communications involving ALEJANDRA wherein she refers to OLIVARES HERNANDEZ as her father.

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

10

HERNANDEZ, SHERMAN, AND MARTINEZ

22. On August 20, 2015, agents intercepted a series of communications between OLIVARES HERNANDEZ, SHERMAN JR, and MARTINEZ. I believe these communications were related to the coordination of a drug deal between OLIVARES HERNANDEZ (the supplier), MARTINEZ (the facilitator/courier) and SHERMAN JR (the bulk-customer/distribute). A summary of these communications and my understanding of their significance are outlined below.

a. <u>Communications between SHERMAN JR and OLIVARES HERNANDEZ:</u> At approximately 9:26 a.m. on August 20, 2015, OLIVARES HERNANDEZ received a text message via the Intercepted Telephone 3. The message was sent via telephone (707) 655-8923, which is a telephone number used by SHERMAN JR.

At approximately 10:31 a.m., OLIVARES HERNANDEZ contacted SHERMAN JR via the aforementioned telephone number. During this intercepted communication, OLIVARES HERNANDEZ asked if SHERMAN JR was "ready" and he replied "no" and explained it was "really slow." Next, OLIVARES HERNANDEZ said his other "load" was probably coming by this weekend.[8] SHERMAN JR. acknowledged and said he would give "whatever [he] had to the nephew." OLIVARES HERNANDEZ acknowledged. SHERMAN JR. then asked OLIVARES HERNANDEZ for the nephew's number. OLIVARES HERNANDEZ acknowledged and agreed to provide his nephew's number.

At approximately 11:46 a.m., OLIVARES HERNANDEZ called MARTINEZ via Intercepted Telephone 3. During the call, OLIVARES HERNANDEZ said he needed to ask MARTINEZ something. MARTINEZ acknowledged. OLIVARES HERNANDEZ said he was going to give MARTINEZ "Mike's number" so that MARTINEZ could call Mike. MARTINEZ acknowledged. OLIVARES HERNANDEZ said for MARTINEZ to send [Mike] a text just

---

[8] During the coming weekend (i.e. August 21, 2015), agents intercepted multiple calls between OLIVARES HERNANDEZ and a Southern California-based drug courier discussing the delivery of a drug shipment. Agents later conducted surveillance operations of the suspected delivery at 13697 South Avenue in Delhi, California on such date. Agents observed a suspected load car arrive, enter the bar, and depart soon thereafter. This address was later confirmed to be a drug stash location during the search warrants executed on October 13, 2015, as discussed above.

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

11

letting him know this was MARTINEZ's number. MARTINEZ acknowledged. OLIVARES HERNANDEZ gave the following number: (707) 655-8923. MARTINEZ repeated the number to OLIVARES HERNANDEZ and said he [MARTINEZ] would call "Mike" right now.

      b.    <u>Significance of Intercepted Communications:</u>  I believe the above conversations are related to drug trafficking. Specifically, I believe SHERMAN JR is a bulk drug customer/dealer supplied by OLIVARES HERNANDEZ. My belief is based on the communications above, as well as other interceptions involving SHERMAN JR wherein he placed drug orders from OLIVARES HERNANDEZ. In the instant calls, I believe SHERMAN JR and OLIVARES HERNANDEZ are referring to MARTINEZ as the "nephew." (Agents have intercepted numerous calls wherein MARTINEZ is referred to by the participants as the "nephew.") I further believe OLIVARES HERNANDEZ relayed to SHERMAN JR that he (i.e. OLIVARES HERNANDEZ) was expecting a new shipment of drugs in the coming days and wanted to know whether SHERMAN JR was interested in making a drug purchase at such time. In response, SHERMAN JR commented that it was "slow," which I believe indicated he did not presently need to be resupplied with drugs. Further, I believe the participants discussed coordinating the transfer of a drug payment owed by SHERMAN JR to OLIVARES HERNANDEZ via MARTINEZ. During this portion of their discussion, SHERMAN JR asked OLIVARES HERNANDEZ for MARTINEZ's contact information to facilitate the delivery. Next, I believe OLIVARES HERNANDEZ contacted MARTINEZ and provided him with SHERMAN JR's telephone number, who he referred to as "Mike" (SHERMAN JR's first name is Michael). I also believe is significant that OLIVARES HERNANDEZ did not need to provide MARTINEZ with instructions about the reasons to contact "Mike," which indicates MARTINEZ has coordinated the delivery/receipt of drugs and/or drug-related payments to/from SHERMAN JR on prior occasions.

      **3.**    ***Search of MARTINEZ's Residence and the Seizure of Drugs, Money, and Guns***

23.    On October 22, 2015, law enforcement executed a federal search warrant at MARTINEZ's residence at 29394 Pacific Street, Hayward, California and arrested MARTINEZ. At his

residence, agents discovered two cellular telephones used by MARTINEZ and previously intercepted in communications with the Intercepted Telephone 3 and the Intercepted Telephone 4. Agents also located three firearms and ammunition inside the residence.

24. Based on the surveillance observations, intercepted communications, and evidence seized from MARTINEZ's residence, I believe MARTINEZ is a co-conspirator of OLIVARES HERNANDEZ, SHERMAN JR, and others and MARTINEZ is involved in a conspiracy to traffic cocaine and methamphetamine beginning on a date unknown, but no later than August 12, 2015 and continuing to October 13, 2015.[9]

### D. SHERMAN JR

25. The intercepted communications, surveillance observations, and items seized from SHERMAN JR's residence described below establish probable cause that he conspires with one or more members of the subject DTO to distribute drugs. Further, the items discovered in his residence indicate SHERMAN JR likely receives bulk quantities of drugs, which he breaks down into smaller distribution-size quantities and resells to his customers.

#### 1. *Identification of SHERMAN JR*

26. On October 16, 2015, CPD detectives used physical location data obtained from SHERMAN JR's cellular telephone (which was intercepted in communications with the Intercepted Telephone 3) to electronically track his whereabouts. At approximately 2:10 p.m., they used this data to physically locate SHERMAN JR at 1514 Magazine Street in Vallejo, California. At this location, the detectives observed SHERMAN JR and Delano Costello SHERMAN JR (hereafter, "the Brother") sitting in an Acura sedan outside of a residence. Shortly thereafter, SHERMAN JR and the Brother drove from the address to a nearby Wendy's Restaurant. They entered and remained inside the Wendy's restaurant for approximately 25 minutes. Meanwhile, officers noted the physical location data from SHERMAN JR's cellular telephone likewise showed he was present at the restaurant. At approximately 3:15 p.m., officers observed SHERMAN JR and the Brother exit the Wendy's, enter the Acura sedan,

---

[9] Agents began intercepting OLIVARES HERNANDEZ's communications via the Intercepted Telephone 3 on August 12, 2015. OLIVARES HERNANDEZ was arrested on October 13, 2015 and charged with violations of 21 U.S.C. §§ 846 and 841(a)(1),(b)(1)(A).

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

and depart the area with SHERMAN JR driving the vehicle. Soon thereafter, a Vallejo Police Department (VPD) officer conducted a traffic stop of SHERMAN JR's vehicle. During the stop, SHERMAN JR produced a California Driver's License (CDL) identifying him as Michael Anthony SHERMAN JR with a date of birth of January 28, 1970. The Brother also produced a CDL, which identified him as Delano Castello SHERMAN with a date of birth of January 20, 1966.

27. Law enforcement also conducted surveillance of SHERMAN JR on October 14, 2015 and discovered SHERMAN JR's movements matched those of the cellular telephone intercepted in communication with OLIVARES HERNANDEZ. Of note, SHERMAN JR was the only male occupant of the vehicle during the surveillance timeframe. Based on facts described herein, I believe SHERMAN JR was the individual in communication with OLIVARES HERNANDEZ using the subject cellular device(s).

### 2. *Examples of Interceptions and Surveillance Observations Connecting SHERMAN JR to Conspiracy and DTO Activities*

i. <u>SHERMAN JR Discusses Suspected Drug Payment with OLIVARES HERNANDEZ</u>

28. On August 17, 2015 at approximately 1:07 p.m., the Intercepted Telephone 3 received a call from SHERMAN JR using (510) 866-9485. During the call, I believe OLIVARES HERNANDEZ and SHERMN JR discussed the quality of drugs and payments for drugs. A summary of the call and my understanding of its significance is summarized below:

   a. <u>Communication</u>: SHERMAN JR asked if OLIVARES HERNANDEZ was "ready" and OLIVARES HERNANDEZ agreed. SHERMAN JR asked OLIVARES HERNANDEZ what was the name on "it." OLIVARES HERNANDEZ replied he thought it was, "M.I.L." SHERMAN JR repeated "M.I.L" and OLIVARES HERNANDEZ affirmed. Next, SHERMAN JR asked if, "they" were "good." OLIVARES HERNANDEZ confirmed. SHERMAN JR said he had most of the "paper" already and had to go get "paper for four more." OLIVARES HERNANDEZ told SHERMAN JR to "get the paper first." SHERMAN JR said he had "it" already and needs to "count it". SHERMAN JR added he, "will check the paper" and get back to OLIVARES HERNANDEZ.

1       b.    <u>Significance of Communication</u>: I believe the participants in the conversation above used code to discuss their readiness to conduct a drug transaction. Specifically, I believe they discussed whether OLIVARES HERNANDEZ (the supplier) had drugs available (referred to in code as "ready") and whether SHERMAN JR (the customer) had money (referred to in code as "paper") to conduct the purchase. I further believe SHERMAN JR's question about the name on "it" and OLIVARES HERNANDEZ's response of "M.I.L" was a discussion about the type of drugs and/or markings on the drug packaging. (Of note, DEA databases indicate that cocaine has been seized at the U.S.-Mexican border in packaging marked with "M.I.L.") I further believe when SHERMAN's asked about whether "they were good" was a question about the quality of the drugs. After discussing the quality and availability of the drugs, I believe SHERMAN JR told OLIVARES HERNANDEZ that he had most of money (referred to in code as "paper"), but needed to obtain more money to purchase four additional units of the requested drugs (referred to in code as "paper for four more"). OLIVARES HERNANDEZ instructed SHERMAN JR to obtain the additional money (i.e. get the "paper" first) before contacting OLIVARES HERNANDEZ again to arrange for the anticipated drug purchase.

      ii.    <u>SHERMAN JR Discusses Suspected Poor Quality of Drugs Supplied by OLIVARES HERNANDEZ</u>

29.    At approximately 10:42 a.m. on September 2, 2015, OLIVARES HERNANDEZ called SHERMAN JR via the Intercepted Telephone 3. A summary of the call and my understanding of its significance is summarized below:

      a.    <u>Communication</u>: During the call, SHERMAN JR said he was having problems because third parties were saying "it tasted like gas." OLIVARES HERNANDEZ asked what tasted like gas. SHERMAN JR replied, "the work." OLIVARES HERNANDEZ asked "which dope?" SHERMAN said "the silver one." SHERMAN said he had to go back and get some from a lady who was calling SHERMAN all day. SHERMAN said he had to give her money back. OLIVARES HERNANDEZ asked what kind SHERMAN got. SHERMAN said "the one that said M.I.L. OLIVARES HERNANDEZ acknowledged and said that he was going to call the

"guy."

   b.   <u>Significance of Communication</u>: I believe the above conversation relates to drug trafficking. More specifically, I believe SHERMAN JR relayed to OLIVARES HERNANDEZ that customers (i.e. the third parties) complained about the quality of the drugs (i.e. "work") OLIVARES HERNANDEZ sold to SHERMAN JR because they thought it "tasted like gasoline." I know drug traffickers use a myriad of techniques to mask the scent of narcotics during transport, including the use of gasoline, to thwart detection by law enforcement. As such, I believe the customers' complaint may relate to the taste or smell infused into the drugs from the manner it was smuggled or transported by the DTO. Furthermore, I believe OLIVARES HERNANDEZ's question of "which dope" and SHERMAN's response of "the silver one" that said "M.I.L" indicates they discussing cocaine. I believe they are referring to cocaine because "silver" is a common slang term for cocaine. I also believe the "M.I.L." reference is to a marking embedding on the product. Lastly, I believe OLIVARES HERNANDEZ acknowledged SHERMAN JR's complaint and relayed his intention to check with the drug transporter (i.e., "the guy") to inquire about the gasoline contamination.

   iii.   <u>SHERMAN JR Discusses Drug Payment with OLIVARES HERNANDEZ</u>

30.   At approximately 7:50 p.m. on October 10, 2015, OLIVARES HERNANDEZ received a call from SHERMAN JR via the Intercepted Telephone 4. Soon thereafter, they communicated again in another telephone call. A summary of the calls and my understanding of their significance is summarized below:

   a.   <u>Communication</u>: During their conversation, SHERMAN JR asked if OLIVARES HERNANDEZ's "nephew" was around at the house. OLIVARES HERNANDEZ said that he was going to call the nephew. SHERMAN JR said he has "23" and that he (SHERMAN JR) would call "him" (i.e. the nephew) to see if he was at the house. OLIVARES HERNANDEZ said he will call to see if "he" (i.e. the nephew) wanted to come to SHERMAN JR. OLIVARES HERNANDEZ said he will call SHERMAN JR right back.

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

16

  b. <u>Significance of Communication</u>: I believe the above-referenced call relates to drug trafficking. Specifically, I believe OLIVARES HERNANDEZ inquired about drug proceeds SHERMAN JR owed to OLIVARES HERNANDEZ. Further, I believe SHERMAN JR responded that he possessed $23,000 (referred to in shorthand-fashion as "23") and would provide the money to the "nephew" (MARTINEZ), who would then deliver it to OLIVARES HERNANDEZ. Lastly, I believe OLIVARES HERNANDEZ said he will call the "nephew" (MARTINEZ) to see if he could visit SHERMAN JR and retrieve the money.

  c. <u>Follow-up Communication</u>: Approximately six minutes after the end of the call discussed above, SHERMAN JR called OLIVARES HERNANDEZ. During their conversation, SHERMAN JR said he just talked to "him" and asked if OLIVARES HERNANDEZ wanted SHERMAN JR to "give them" to "him." Next, SHERMAN JR said he had "23,000 right now" and OLIVARES HERNANDEZ acknowledged.

  d. <u>Significance of Follow-up Communication</u>: I believe the above-referenced call relates to the transfer of drug-related proceeds. I believe SHERMAN JR contacted OLIVARES HERNANDEZ to confirm that he spoke with the "nephew" to coordinate the transfer of the drug payment owed to OLIVARES HERNANDEZ and confirmed the payment amount of $23,000 ("23,000"). In response, I believe OLIVARES HERNANDEZ affirmed the plan of delivering this amount to the nephew on OLIVARES HERNANDEZ's behalf.

  **4.** ***Search of SHERMAN JR's Residence and Seizure of Suspected Drug Proceeds***

  31. On October 21, 2015, agents and CPD officers executed a federal search warrant at SHERMAN JR's residence, located at 315 Emory Oak Place, Lathrop, California, and arrested SHERMAN JR. During the search, agents discovered bulk cash hidden within articles of clothing inside a closet affiliated with a spare and apparently unoccupied bedroom. The money was packed in bundles, which were separated by their denominations and secured with rubber-bands. Agents estimate the approximate value of the seized currency to be $30,000. I know it is common for drug traffickers to retain large sums of U.S. currency because they often pay their suppliers in cash and receive cash from their customers. Drug traffickers often operate in their illegal business in cash to avoid law enforcement

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

detection. During the search, agents also discovered two cellular telephones which had been used to communicated with OLIVARES HERNANDEZ via the Intercepted Telephone 3 and the Intercepted Telephone 4.

32. Based on surveillance observations, intercepted telephone calls, the items seized from SHERMAN JR's residence, and the investigation to date, I believe SHERMAN JR is a co-conspirator of OLIVARES HERNANDEZ, MARTINEZ, and others and he is involved in a conspiracy to trafficking cocaine and methamphetamine beginning on a date unknown, but no later than August 12, 2015 and continuing to October 13, 2015. I further believe SHERMAN JR is drug trafficker who received bulk quantities of narcotics from OLIVARES HERNANDEZ and distributes the drugs in the Central Valley and/or San Francisco Bay Area.

### 5. *SHERMAN JR's Criminal History*

33. SHERMAN JR's criminal history includes at least one prior felony and numerous arrests for drug-related offenses. In 1989, SHERMAN JR was convicted of felony possession of cocaine base for sale. In 1990, SHERMAN JR was arrested for felony transportation/selling narcotics. In 1992, SHERMAN JR was arrested for felony possession of cocaine base and for being a felon in possession of a firearm. In 2001, SHERMAN JR was arrested for felony possession and transportation of cocaine base. In 2010, SHERMAN JR was arrested for possession of marijuana, cultivating marijuana, possession of narcotics for sale, theft of utility services, possession of drug proceeds, money laundering, and conspiracy.

## IV. SEALING REQUEST

34. I believe that, should the contents this affidavit and complaint be made public, it would jeopardize this continuing investigation and law enforcement personnel participating in this investigation. I also know, based upon my training and experience, that if those communicating with MARTINEZ, SHERMAN JR, and/or their co-conspirators learn of the existence and scope of the subject investigation, they may have the opportunity to destroy other evidence, notify co-conspirators, and/or cause co-conspirators to flee from prosecution. For the foregoing reasons, and because this is an

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

ongoing investigation, I request that the complaint and the accompanying affidavit be sealed until further order of the Court to avoid the aforementioned adverse results.

## V. CONCLUSION

35. Based on the foregoing facts, my training and experience, and consultation with other law enforcement agents with experience in drug trafficking investigations, I believe there is probable cause to believe that Carlos MARTINEZ JR and Michael Anthony SHERMAN JR violated 21 U.S.C. §§ 846 and 841 (a)(1), (b)(1)(A)(viii) (conspiracy to distribute and possession with intent to distribute controlled substances, including cocaine and 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers) beginning on a date unknown, but no later than August 12, 2015 and continuing to October 13, 2015.

_____
RAYMUNDO M. MALLARI
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this 23rd day of October, 2015.

_____
HONORABLE BERNARD ZIMMERMAN
United States Magistrate Judge

MALLARI AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]